Judgment rendered April 27, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,193-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

LAQUANISHA LEROYCIA MCCOY          Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 359,999

Honorable Charles Gordon Tutt, Judge

* * * * *

F. EDWARD MOUTON, III                       Counsel for Appellant

JAMES E. STEWART, SR.                        Counsel for Appellee
District Attorney

WILLIAM C. GASKINS
BRITTANY B. ARVIE
REBECCA A. EDWARDS
Assistant District Attorneys

* * * * *

Before MOORE, COX, and HUNTER, JJ.

**COX, J.**

This criminal appeal arises from the First Judicial District Court, Caddo Parish, Louisiana. The defendant, Laquanisha Leroycia McCoy ("McCoy"), was unanimously convicted of theft of property having a value exceeding $25,000, in violation of La. 14:67(B)(1). McCoy was sentenced to 15 years at hard labor. McCoy now appeals, arguing that her sentence is unconstitutionally excessive. For the following reasons, we affirm McCoy's sentence.

## FACTS & PROCEDURAL HISTORY

In March of 2017, Santa Maria Produce ("Santa Maria"), a wholesale grocery distribution company, hired McCoy as a general office clerk. McCoy was responsible for assisting in office sales, which included taking customer orders and taking payments to generate order slips and invoices, in addition to general clerical tasks, including answering phone calls and filing paperwork. Thereafter, McCoy was also responsible for processing sales through batching credit card transactions.

On June 12, 2018, McCoy gave notice that she planned to terminate her employment. That same day, Charlotte Baker ("Baker"), an employee from Heartland Payment System,[1] the payment processor for Santa Maria, contacted Joseph Glorioso, one of the managers of Santa Maria. She informed him that their system flagged multiple thousand-dollar fraudulent and unverified refunds transferred from Santa Maria's account. On June 19, 2018, after Heartland confirmed that the credit card used and the account to which the money was transferred belonged to McCoy, Joseph Glorioso fired

_____

[1] Heartland is a payment processing company that facilitates payments from individual banks to merchants.

her and contacted Sergeant Jared Woods ("Sgt. Woods"), a detective for the Financial Crimes Task Force within the Shreveport Police Department ("SPD"), to investigate the incident.

After confirming that the credit card and bank account belonged to McCoy, Sgt. Woods interviewed McCoy a few weeks later. During the interview, McCoy presented Sgt. Woods with a cashier's check for $32,356.52 and a handwritten log she claimed detailed her work schedule and overtime hours. McCoy explained that she was overpaid for her accumulated overtime hours and wanted to return the excess payments. After further investigation with Heartland, Sgt. Woods issued an arrest warrant against McCoy for felony theft in violation of La. R.S. 14:67. McCoy was subsequently charged by bill of information, arrested, and released on bond.

On November 30, 2020, the three-day trial commenced, wherein the following witnesses testified at trial: Santa Maria owners, Joseph, Josephine, and Vincent Glorioso;[2] Baker; Sgt. Woods; Santa Maria employees Nina Glorioso, Greg Gander ("Gander"), Karen Maxwell ("Maxwell"), Megan Tilley ("Tilley"), and Christopher Mandigo ("Mandigo"); and finally, McCoy testified on her own behalf.

First, Joseph Glorioso testified that as vice president of the company, he was responsible for the daily operations of the business, including sales, purchasing, and food safety. He stated that in March 2017, McCoy was hired as a full-time office employee and was initially responsible for customer relations, sales, data input, filing, taking payments, and later,

---

[2] To avoid confusion, Joseph, Josephine, and Vincent Glorioso are referred to by their first names throughout different sections of this opinion.

2

batching credit card payments. Mr. Glorioso explained that when credit payments were batched, their credit card processor, Heartland, would confirm the authenticity of each credit card transaction and transfer all verified funds into Santa Maria's bank account. He stated that on June 12, 2018, he received a call from Baker, informing him that approximately eight fraudulent transactions, totaling $78,933.02, were refunded from Santa Maria's account into McCoy's account.

Joseph stated that while McCoy, like other authorized personnel, would have had access to the credit terminal,[3] where payments were taken, and been privy to the amount of money processed into Santa Maria's bank account, she would not have been promised additional money or authorized to transfer any amount of those funds into her personal bank account. He testified that McCoy could not have earned that amount of money as she was only paid $10.60 an hour and paid on a biweekly basis.[4]

Josephine Glorioso, president of the company, explained that although she only worked with McCoy in the office on a few occasions, neither she nor any other employee would have promised McCoy any portion of the $78,933.02 refunded from Santa Maria's account.

Vincent Glorioso testified that as warehouse manager, he primarily oversaw the daily operations of the warehouse facility.[5] He stated that he

---

[3] Customers made payments for orders either by cash, check, or credit card. Credit card transactions were processed at a credit terminal located on a back wall in the office area.

[4] It was later discussed at trial that McCoy worked approximately 40 hours a week and received a 60-cent per hour raise, for a total of $10.60 an hour. It was calculated that she would have earned approximately $21,000 yearly.

[5] Although he primarily works in the warehouse, Vincent testified that he would occasionally work in the office starting at 4:30 a.m. or 5:00 a.m., taking any orders left on the voicemail and inserting orders until warehouse employees arrived.

would personally give tips to warehouse employees on some Saturdays as he saw fit, with tips ranging from $20 to $100 dollars. He explained that this gratuity was exclusively reserved for warehouse employees and that he never extended this offer to McCoy or any other office employee, regardless of how long they were employed with the company. Mr. Glorioso stated that he never asked McCoy to work unrecorded overtime hours in exchange for additional pay and tips. He denied that McCoy ever showed him a log of overtime hours or that he approved and deposited any money into McCoy's bank account.

Baker testified that she was a member of Heartland's risk management section for fraud detection. She explained that Heartland's fraud monitoring system flags certain transactions such as refunds or forced transactions as fraudulent until verified otherwise. She stated that on June 12, 2018, she detected a fraud alert on Santa Maria's account and immediately contacted one of the owners, informing him that she detected eight separate refunds to a single credit card without having a positive sale attached to it.[6] She then confirmed that the credit card and bank account associated with the refunds belonged to McCoy. Baker stated that based on the type of credit terminal used at Santa Maria, all credit transactions were either manually keyed in, physically swiped, or chipped. Based on the information provided in the monitoring system, Baker then testified that each of the eight transactions was physically swiped by someone possessing the credit card in question.

---

[6] Baker explained that this meant that while a refund was issued to the credit card, there was no prior transaction confirming that a sale occurred to authorize the refund amount.

Sgt. Woods then testified that he was the lead investigator for this case. He stated that during his investigation, he discovered that from April 2018 until June 2018, several multiple thousand-dollar transactions were refunded from Santa Maria's account into McCoy's bank account using her credit card. He stated that after he confirmed this information with Heartland, he immediately contacted McCoy, who agreed to speak with him. Instead, two different attorneys contacted him, claiming to represent McCoy. Sgt. Woods stated that on July 2, 2018, a few weeks after he initially spoke with McCoy, she finally came to his office for an interview.

Sgt. Woods stated that during the interview, McCoy presented him with a cashier's check for $32,356.52 and a handwritten log that she claimed detailed her overtime hours and schedule. McCoy admitted to Sgt. Woods that the money was deposited into her account, but explained that she earned a portion of the money through overtime hours Vincent Glorioso allowed her to work. She stated that through overtime hours, she earned approximately $46,576.38,[7] and the remaining $32,356.52 was accidentally deposited into her account.

Next, several Santa Maria employees testified. Nina Glorioso,[8] who was in charge of payroll for Santa Maria, reviewed McCoy's work schedule. She stated that in 2017, McCoy had a fairly regular work shift, working either slightly before or after 9:00 a.m., until 5:00 p.m. or 6:00 p.m., earning approximately $18,241.26 for the year. Ms. Glorioso testified that in 2018,

---

[7] Based on McCoy's handwritten log of her alleged overtime hours, Sgt. Woods explained that of the $46,576.38 McCoy claimed was owed to her, $22,726.38 was due for overtime, and $23,859 was due for tips earned.

[8] Nina Glorioso testified that she is married to Joseph Glorioso. She stated that she primarily worked for the company from home, preparing the payroll and ledger.

McCoy's schedule remained relatively the same, but noted that McCoy earned approximately 20 hours of overtime for some pay periods and earned $13,825.84 for that year.

Gander, the quality assurance manager, explained that from 2017 to 2018, Santa Maria had two separate work shifts: morning shifts from 5:00 a.m. or 5:30 a.m. and night or evening shifts from 1:00 p.m. until 8:00 p.m. Because the shifts were divided, office personnel were never present when warehouse employees finished evening shifts; therefore, McCoy could not have worked late.[9] Gander stated that, to his knowledge, McCoy was only paid through her regular paycheck.

Tilley and Maxwell, former office employees who worked with McCoy, testified that McCoy worked regular shifts with little to no overtime. Maxwell testified that it was unlikely that McCoy accumulated a mass amount of overtime because management restricted the number of overtime hours any employee could earn. Tilley testified that she rarely earned overtime and that office staff was never asked to work late or afforded an opportunity to receive tips.

Mandigo, a warehouse employee, testified that from 2017 to 2018, he worked from 5:00 a.m. or 6:00 a.m. until 2:30 p.m. or 3:00 p.m. He stated that while he never saw McCoy when he arrived to work, he would see her when he left; however, he never knew McCoy to work extra hours either in the morning or evening. Mandigo further explained that McCoy would not have ever received tips because she was not a warehouse employee.

---

[9] Gander stated that he could only recall a few instances in which McCoy arrived to work before him and that only on one occasion did she ever leave work after he did.

Finally, McCoy testified that when she was hired in 2017, she was never given a clear work schedule. With respect to her duties as an office clerk, McCoy testified that she was only instructed to be flexible. She stated that she was later responsible for general office duties, including answering calls, placing orders, filing, and taking payments.[10] McCoy stated that as office staff left, she filled in for those vacancies by batching credit card transactions, printing labels for invoices, assisting with shipping and inventory, and running orders to the warehouse. McCoy stated that in order to finish her work, she had to work overtime almost every day or bring work home with her, surpassing the allotted overtime hours management permitted.

McCoy testified that Joseph "flipped" out and restricted her overtime hours. She stated she considered quitting, but continued to work because Vincent told her that because she was a "good worker. . . [he] would take care of her" by allowing her to work unrecorded overtime hours and depositing her pay personally.[11] For fear that Vincent would not keep his word, McCoy stated that she kept a log of her hours and showed them to Vincent every Friday to verify that he would still pay her for her overtime. She testified that although she continued to work overtime, Vincent failed to deposit any payments. McCoy stated that after Vincent finally began to deposit money into her account, he overpaid her for the last deposit. McCoy testified that she attempted to return the money to Vincent, but was informed

_____

[10] McCoy testified that although she was authorized to take payments at the credit card terminal, she was not able to issue refunds to customers because she did not have an access code, and would have to ask another employee to help her.

[11] McCoy testified that she gave Vincent a voided check so that he would have her bank and credit card information in order to deposit her overtime pay.

that the amount was accurate because "he was taking care of her for the rest of the year."

On December 2, 2020, the jury unanimously found McCoy guilty as charged. In her post-conviction presentencing memorandum, McCoy, in support of her plea for leniency, attached 13 character letters. However, in the State's sentencing memorandum, it noted that five of the character letters were forged.[12] On December 17, 2020, the sentencing hearing took place. The trial court concluded:

> In 894.1(A), I would note that Ms. McCoy has stolen before. She has defrauded before. She has already reoffended by submitting, what appear[s] [sic] to be, forged letters asking for leniency. So, number one is fulfilled.
>
> Whether the defendant needs confinement, I thought earlier, before receiving this fraudulent report, presentence report, that it might be some sort of mental issue, but now it shows, I'm convinced, that Ms. McCoy has just a lifetime of trying to defraud people for money. And paragraph three of that section, a lesser sentence than what I am about to impose would deprecate the seriousness of the offense.
>
> In connection with 894.1(B), I noticed that the offender was offered, or has been offered, or given or received, something of value for the commission of the offense. The offense resulted in a significant permanent injury or significant economic loss to Santa Maria Produce. I don't think they will ever recoup the money that was stolen from them. The amount of money stolen was three times the threshold for the $25,000 crime.
>
> And it appears to me that Ms. McCoy is persistently involved, and has gotten away with a lot of things that have led her to this time, which include the Social Security fraud, the theft at the casino. She committed perjury at trial. She committed defamation by attacking Santa Maria Produce in her stress journal, and particularly, attempting to make a fool out of the owners of Santa Maria Produce, which they are not. And she committed forgery in connection with her filing which may be a

---

[12] The State contacted and confirmed that the following character letters were forged from the following: 1) Mary Rounds, a retired principal of Caddo Magnet High School; 2) Dr. Tim Gilmore, a professor at Bossier Parish Community College; 3) Ms. Julie Anderson, a gymnastics coach at Caddo Magnet High School; 4) Sergeant Carlean Johnson, a former Air Force recruiter; and 5) Ms. Madeline Fegert, a manager for Horseshoe Casino.

8

crime in and of itself. I don't see any mitigating factors in 894.1(B) that apply to Ms. McCoy. Let me say I have labored over this case. I couldn't understand it.

I thought for a while that Ms. McCoy was deranged or delusional; I was wrong. The defendant has grown up with, and practiced, deceit, apparently, her whole life. She abused this Court and 14 jurors for three days. And when she couldn't fool the jury, she has tried to fool me with forgery.

The trial court then sentenced McCoy to 15 years at hard labor. This appeal followed.

## ARGUMENTS

On appeal, McCoy presents three assignments of error, each alleging that the trial court committed several errors and abused its discretion by imposing a 15-year sentence at hard labor on a first-time offender without proper consideration of the particular facts and circumstances, resulting in an unconstitutionally excessive sentence.

*Mitigating Factors*

First, McCoy argues that her sentence is unconstitutionally excessive, in part, because the trial court failed to acknowledge or consider the following mitigating factors of La. C. Cr. P. art. 894.1(B):

(22) The defendant's criminal conduct neither caused nor threatened serious harm…
. . .
(27) The defendant has compensated or will compensate the victim of his criminal conduct for the damage or injury that he sustained.

(28) The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the instant crime.
. . .
(31) The imprisonment of the defendant would entail excessive hardship to himself or his dependents.
. . .
(33) Any other relevant mitigating circumstance.

9

McCoy contends that although her actions resulted in monetary loss to Santa Maria and its owners, the offense committed was a crime against property, therefore the probability of physical harm or serious bodily injury did not exist. She notes that she has partially compensated Santa Maria for the loss when she provided Sgt. Woods with a cashier's check for $32,356.52. McCoy argues that she was only 22 years old at the time the offense was committed, is sole financial provider for her household, and that absent the offense in question, she has no criminal history, no subsequent arrests, indictments, charges, or convictions filed against her.

*Improper Influence*

McCoy further argues that the trial court was unduly influenced by the unadjudicated other crimes or bad acts provided in the State's sentencing memorandum. Specifically, the State alleged the following against McCoy:

1.) The $57,892.09 that the Social Security Administration determined [McCoy] and her mother wrongfully received through false assertions of disability.

2.) The apparently unadjudicated theft that [McCoy] committed at the casino, leading to her firing.

3.) [McCoy] committed [p]erjury (La. R.S. 14:123) at trial.

4.) [McCoy] committed criminal defamation (La. R.S.14:47) by defaming the Glorioso's, other employees at Santa Maria Produce, and other people whom she defamed in her "stress journal."

5.) [McCoy] arguably committed [f]orgery (La. R.S. 14:72) by submitting false letters for mercy to the [c]ourt. (Note that a document must be a "writing purporting to have legal efficacy" to fulfill the forgery statute; but note also that the fact the letters are not signed does not stop them from being forgeries).

6.) [McCoy] arguably committed [f]iling or [m]aintaining [f]alse [p]ublic [r]ecords (La. R.S. 14:133) because she knew that the false letters would be filed for record in a public office or with a public official.

10

Based on these allegations, McCoy argues that the trial court, as reflected by the sentencing colloquy, was unduly influenced by the listed acts when it stated:

> In 894.1, I would note that Ms. McCoy has stolen before. She has defrauded before. She has already reoffended by submitting, what appear[s] [sic] to be, forged letters asking for leniency. . .Whether the defendant needs confinement, I thought earlier, before receiving this fraudulent report, presentence report, that it might be some sort of mental issue, but now it shows, I'm convinced, that Ms. McCoy has just a lifetime of trying to defraud people for money.
> . . .
> And it appears to me that Ms. McCoy is persistently involved, and has gotten away with a lot of things that have led her to this time, which include the Social Security fraud, the theft at the casino. She committed perjury at trial. She committed defamation by attacking Santa Maria Produce in her stress journal, and particularly, attempting to make a fool out of the owners of Santa Maria Produce, which they are not. And she committed forgery in connection with her filing which may be a crime in and of itself.

McCoy asserts that she was never arrested, prosecuted, or had charges filed against her for any of the State's purported allegations. In particular, McCoy notes that the State's claims of disability fraud are unsupported as the exhibits concerning the matter were sealed and not made part of the record. Similarly, she argues that her termination for theft from her former job at a casino is also unfounded because the acting manager at that time never filed charges against her.

With respect to the State's allegations against her for perjury, McCoy notes that the State failed to specify whether the alleged perjury was testimonial or resulted from falsified materials tendered to the trial court. If testimonial, McCoy argues that during trial there are always conflicting narratives, however, this alone does not necessarily result in perjury. In acknowledging that providing falsified materials to the trial court was

11

deplorable, McCoy nevertheless disputes this claim for perjury because she was not charged, arrested, or prosecuted for the claim.

*Impermissible Animus*

Finally, McCoy argues that the trial court was impermissibly biased or reflected animus toward her during sentencing as referenced in the following statement:

> She abused this Court and 14 jurors for three days. And when she couldn't fool the jury, she has tried to fool me with forgery.

McCoy argues that although proffering false testimony or evidence is deplorable, her right to present a defense on her behalf is absolute and the exercise of her right to trial was not an abuse of the court. McCoy argues that the trial court's statement did not align with proper trial decorum expected from an objective, nonbiased trier of fact. She asserts that the trial court's statements indicate that it considered her tendering of false documents as a direct and personal insult and as a result, she was given an unconstitutionally harsh sentence.

In support of this assertion, McCoy cites *State v. Franklin*, 42,055 (La. App. 2 Cir. 5/9/07), 956 So. 2d 823, *writ denied*, 07-1489 (La. 1/11/08), 972 So. 2d 1162. There, the defendant, while employed as a vault teller at a bank, was charged with two counts of forgery and one count of felony theft having a value of $120,000 over the course of four months. On appeal, this Court affirmed the defendant's sentence of seven years at hard labor, which was to be served consecutively with both counts for forgery.[13]

---

[13] Execution of the seven-year sentence was ultimately suspended and the defendant was placed on supervised probation for five years and ordered to pay restitution totaling $119,950.

She further cites *State v. Jarrett*, 53,525 (La. App. 2 Cir. 6/24/20), 299 So. 3d 1202, where the defendant was convicted of theft for a value exceeding $25,000, in violation of La. R.S. 14:67(B)(1). He was sentenced to eight years at hard labor with all but the first four years suspended, followed by three years' supervised probation conditioned on payment of restitution of approximately $50,000. McCoy highlights that the trial court noted that the defendant presented an undue risk if not incarcerated and that the defendant was belligerent and showed no signs of remorse for his actions.

Finally, she cites *State v. Thibodeaux*, 20-91 (La. App. 3 Cir. 3/17/21), 313 So. 3d 445, where the defendant, employed as the clerk of court in Iberia Parish, was charged with a 14-count bill of indictment, which included three counts of felony theft, with each having a value exceeding $25,000.[14] McCoy notes that although one count of felony theft was vacated, the defendant was only sentenced to five years at hard labor, suspended, with three years' supervised probation. Given the trend of sentences in the aforementioned cases and that her offense is not one of violence, McCoy argues that her 15-year sentence is excessive.

In contrast, the State argues that the cases cited are factually different than the present case. According to the State, none of the cited cases involved a situation in which the defendant attempted to deceive the trial court by filing falsified, forged letters for sentencing consideration.

---

[14] In addition to the three charges of theft, the defendant's other charges included racketeering, filing or maintaining false public records, perjury, and malfeasance in office.

13

**DISCUSSION**

Appellate review of sentences for excessiveness is a two-prong inquiry. Under the first prong, the record must show that the trial court considered the factors in La. C. Cr. P. art. 894.1. The primary goal of La. C. Cr. P. art. 894.1 is for the court to articulate the factual basis for the sentence imposed, and not simply mechanical compliance with its provisions. However, where the record reflects that the trial judge adequately considered the guidelines of the article, then he is not required to list every aggravating or mitigating circumstance. *State v. Smith*, 433 So. 2d 688 (La. 1983); *State v. DeBerry*, 50,501 (La. App. 2 Cir. 4/13/16), 194 So. 3d 657, *writ denied*, 16-0959 (La. 5/1/17), 219 So. 3d 332.

Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. *State v. Lanclos*, 419 So. 2d 475 (La. 1982); *State v. DeBerry, supra*. In sentencing, the important elements which should be considered are the defendant's personal history (age, familial ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation. *State v. Jones,* 398 So. 2d 1049 (La. 1981); *State v. DeBerry, supra*. There is no requirement that specific matters be given any particular weight during sentencing. *State v. DeBerry, supra*; *State v. Shumaker*, 41,547 (La. App. 2 Cir. 12/13/06), 945 So. 2d 277, *writ denied*, 07-0144 (La. 9/28/07), 964 So. 2d 351.

Next, under the second prong of the analysis, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the

14

seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Mandigo*, 48,801 (La. App. 2 Cir. 2/26/14), 136 So. 3d 292, *writ denied*, 14-0630 (La. 10/24/14), 151 So. 3d 600. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166; *State v. Hollins*, 50,069 (La. App. 2 Cir. 8/12/15), 174 So. 3d 710.

When determining whether a defendant's sentence is excessive, a reviewing court should compare the defendant's punishment with the sentences imposed for similar crimes by the same court or other courts. *State v. Johnston*, 50,706 (La. App. 2 Cir. 6/22/16), 198 So. 3d 151, *writ granted on other grounds*, 16-1460 (La. 6/5/17), 221 So. 3d 46; *State v. Ferguson*, 44,009 (La. App. 2 Cir. 2/25/09), 4 So. 3d 315.

A trial court maintains wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of such discretion, a sentence will not be set aside as excessive. Upon review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Davis*, 50,149 (La. App. 2 Cir. 11/18/15), 181 So. 3d 200; *State v. Weaver*, *supra*. Regarding theft, La. R.S. 14:67(B)(1) provides:

> Whoever commits the crime of theft when the misappropriation or taking amounts to a value of twenty-five thousand dollars or more shall be imprisoned at hard labor for not more than twenty years, or may be fined not more than fifty thousand dollars, or both.

Here, we find that the record reflects that the sentencing court appropriately sentenced McCoy given the facts and circumstances of this case.

15

Although McCoy claims that the trial court failed to consider certain mitigating factors as provided in La. C. Cr. P. art. 894.1(B), we find that the trial court specifically stated in its sentencing order that it did not "see any mitigating factors in 894.1(B) that apply to McCoy." The trial court did not fail to consider or acknowledge these factors; rather it found that they were inapplicable to this case, instead, referencing its consideration of the mitigating factors. Specifically, the trial court stated that before the sentencing hearing took place, it labored over this case and that it reviewed both the State's sentencing memorandum as well as McCoy's, which detailed the mitigating factors brought on appeal.

McCoy further claims that the trial court was improperly influenced by the allegations in the State's sentencing memorandum. This Court has previously held that "[i]n the absence of allegations of mistake or falsehood, evidence of uncharged offenses is admissible and is a valid factor for consideration in sentencing." *See State v. Moton*, 46,607 (La. App. 2 Cir. 9/21/11), 73 So. 3d 503, *writ denied*, 2011-2288 (La. 3/30/12), 85 So. 3d 113; *State v. Emerson*, 31,408 (La. App. 2 Cir. 12/9/98), 722 So. 2d 373, *writ denied*, 99-1518 (La. 10/15/99), 748 So. 2d 470. Accordingly, although there are no formal charges or convictions filed against McCoy for the listed allegations, the trial court was nevertheless permitted to consider and even rely upon this information during sentencing. *Id.*

Finally, McCoy argues that the trial court displayed impermissible animus during sentencing. This Court acknowledges that while the trial court's statement that McCoy "abused [the] Court and [the]14 jurors for three days" may have been poorly worded, we nevertheless find that the trial

16

court's statement was directed toward McCoy's action, rather than her personally.

Although this is a nonviolent offense and McCoy is a first-time offender, we find that given the unique circumstances surrounding this case, the trial court did not abuse its discretion in sentencing McCoy. McCoy's sentence is not constitutionally excessive and is well supported by the record.

## CONCLUSION

For the aforementioned reasons, McCoy's conviction and sentence are affirmed.

**AFFIRMED.**